# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TRACKCORE LLC,

                    Plaintiff,

        v.

BIOMEDICAL SYNERGIES, INC.,

                    Defendant.

Civil No. 25-cv-03643

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff TrackCore LLC ("TrackCore"), by and through its attorneys, alleges as follows in support of its Complaint against Defendant Biomedical Synergies, Inc. ("BSI"):

### Nature of the Action

1.      TrackCore brings this action against BSI in connection with BSI's unfair competition, deceptive trade practices, and defamation in violation of common law and federal and state statutes, and seeks declaratory judgements of noninfringement, invalidity, and unenforceability of BSI's U.S. Patent Nos. 8,666,762 and 10,671,706 under 35 U.S.C. § 1 *et seq.* and 28 U.S.C. §§ 2201 and 2202.

2.      TrackCore is a leading provider of tissue and implant tracking software, which enables hospitals to enhance patient safety, streamline inventory management, and ensure compliance with stringent regulatory standards. Different versions of TrackCore's software have been serving hospitals and patients for

nearly 20 years.  Now, years after TrackCore entered the market, and more than a decade after the '762 Patent was granted and about five years after the '706 Patent was granted, BSI, which markets and sells competing software, sent TrackCore threat letters, choosing to wrongfully and baselessly accuse TrackCore of infringing these patents rather than attempting to compete with TrackCore on the merits of their products.  To make it worse, BSI has sent copies of these baseless, false, and misleading threat letters to TrackCore's customers, attempting to interfere with TrackCore's business relationships and disparage TrackCore's goodwill.

3.     To protect its rights and reputation, TrackCore seeks, among other things, declarations that the patents identified in BSI's threat letters are not only not infringed by TrackCore's software but are also invalid and unenforceable.  BSI knew of these issues, but, seeking competitive advantage, issued its threat letters to TrackCore and its customers anyway and did so in bad faith.

**The Parties**

4.     TrackCore is a Delaware limited liability company with a principal place of business at 25 Commerce Avenue, SW, Suite 200, Grand Rapids, Michigan 49503.  TrackCore is a leading provider of tissue and implant tracking software and a trusted partner to over 1,300 healthcare facilities nationwide, including major commercial, nonprofit, and government organizations, like the Department of Veterans Affairs and the U.S. Defense Health Agency.  TrackCore's inventory solutions cover bill-only items, consumables, donor milk, surgical implants, and tissue/biologics while streamlining the tracking and traceability for high-value

products and help hospitals comply with evolving FDA requirements and accrediting body standards (e.g., the Joint Commission, DNV, American Association of Tissue Banks, Association for the Advancement of Blood and Biotherapies, Center for Improvement in Healthcare Quality) while reducing costs, minimizing waste and financial risk, and improving clinical workflows. With TrackCore, health systems can eliminate arduous manual processes and inconsistent data resulting in data entry errors, like enabling automated and consistent data entry in clinical systems through the use of custom barcodes, as well as eliminating other administrative tasks, allowing clinicians to focus on care delivery and patient safety.

5.    On information and belief, BSI is a Minnesota corporation with a principal place of business at 2740 Deer Run Trail E, Long Lake, Minnesota 55356. BSI purports to be a "professional health care consulting company" and to have "developed" TRACS4Life, which BSI describes as a "tissue management and tracking software solution" that "uses manufacturers' barcodes to track and trace human tissue products through a facility's supply chain." *See* http://www.tracs4life.com (emphasis removed). BSI is the named assignee of U.S. Patent Nos. 8,666,762 (the "'762 Patent") and 10,671,706 (the "'706 Patent") (together, the "Asserted Patents"). True and correct copies of the Asserted Patents are attached hereto as Exhibits A and B.

## Jurisdiction and Venue

6.    This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Lanham

Act § 43; and state and common laws concerning unfair competition, deceptive trade practices, and defamation. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 1367, 2201, and 2202.

7.      There is an actual and justiciable controversy between TrackCore and BSI regarding the validity, enforceability, and infringement of the Asserted Patents, and whether BSI's misleading, deceptive, and bad faith communications to TrackCore's customers concerning TrackCore's supposed infringement of the Asserted Patents, constitute unfair competition, deceptive trade practices, and/or defamation. True and correct copies of the parties' correspondence and BSI's correspondence to TrackCore's customers are attached hereto as Exhibits C–G.

8.      This Court has personal jurisdiction over BSI because it is a Minnesota corporation with a principal place of business in Minnesota. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

**Factual Background**

9.      In the 2000s, as cases of infections diagnosed in organ transplant recipients that had been traced to contaminated or diseased donated tissue became well publicized, the FDA and various standard and accreditation organizations, such as the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission"), were developing or revising rules and guidance for hospitals and tissue banks to ensure that organizations had well-coordinated systems for managing tissue implanted into patients.

10.    For example, in May 2005, the FDA issued its Current Good Tissue Practice for Human Cells, Tissues, and Cellular and Tissue-Based Products ("HCT/Ps") that were "developed to improve the safety of HCT/Ps by preventing the introduction, transmission, and spread of communicable disease." *See* CDC, Morbidity and Mortality Weekly Report (May 20, 2005).  These FDA regulations required "HCT/P establishments to recover, process, store, label, package, and distribute HCT/Ps in a way that prevents the introduction, transmission, or spread of communicable diseases," and to "maintain complaint files and evaluate each complaint relating to core CGTP requirements."  *Id.*  The regulation also required an investigation into "any adverse reaction involving a communicable disease related to an HCT/P they made available for distribution" and reporting to FDA "any serious adverse reactions involving a communicable disease."  *Id.*

11.    Nearly simultaneously with the issuance of the FDA regulations, the Joint Commission issued revised standards for the laboratory accreditation program and adopted those standards for hospitals and for accreditation programs for hospitals and tissue banks.  For example, the Joint Commission's new standards incorporated detailed evaluative checklists for assessments of whether a "hospital uses standardized procedures to acquire, receive, store, and issue tissues" (Standard PC.17.10); a "hospital's record keeping permits the traceability of all tissues from the donor or source facility to all recipients or other final disposition" (Standard PC.17.20); and a "hospital has a defined process to investigate adverse events to tissue or donor infections" (Standard PC.17.30).

12.    Meanwhile, the industry was developing and offering systems for use by hospitals and tissue banks that leveraged the use of computers, processors, databases, and enhanced technology such as the use of bar codes, to help organizations track implantable tissues and record and organize related data for patient safety and efficiency; these systems also, at least in part, helped to ensure compliance with the developing regulatory landscape and standard requirements. For example, on information and belief:

A. In or around July 2006, Integrated Medical Systems International ("IMS") launched ImplantMotion (later known as ReadyTracker® Tissue), which "provides customized reporting for up-to-the-minute information on implants and related events"; "[p]roduces reports required to meet [the Joint Commission's] standards with speed and accuracy"; and "[e]ases workflow process with point and click interfacing[.]" IMS Website, www.imsred.com (July 10, 2006).

B. At least by February 2005, Rosebud Solutions (later acquired by McKesson Medical) launched SafeNET, which was a "P.C. based software system designed to track implant devices from the time they are received in inventory through patient implant, removal and final disposal" and touted the benefits of "[a]utomatic reporting to the manufacturer," "[g]enerat[ing] reports documenting significant activity concerning each device," using "a single screen with quick tabs combining all tracking functions," "[i]dentif[ing] the status of patients with tracked implants," and "[m]eet[ing] legal and FDA requirements." *See* Rosebud Website, www.rosebudsolutions.com/safenet.htm (Feb. 18, 2005).

C. At least by March 2006, Champion Medical Technologies launched GraftTracker®, which "monitors inventory receipts, transfers, storage records, and patient implant records utilizing the natural administrative workflow employed by most hospitals" and "was created to assist hospitals in complying with [the Joint Commission's 2005 standards] with an efficient and easy to use, web-based system." *See* Champion Medical Technologies Website, www.grafttracker.com (Nov. 4, 2006).

D. Additionally, the Owens & Minor Cyrus Implant Tracking System had also been available for tracking transplantable materials.

13.    Moreover, in 2006, the initial version of TrackCore® Operating Room was designed, developed, and launched as Tissue TrackCore by LPiT Solutions (now TrackCore).  LPiT Solutions secured one of its first contracts in November 2006 with Hackley Hospital in Muskegon, Michigan, with training and implementation following shortly thereafter.

**BSI's Prosecution of Its Patents**

14.    As the new rules and standards were being developed and new technologies were being developed and/or launched by its future competitors, on September 21, 2006, BSI took the first step in pursuing patents directed to a "tissue tracking and tracing system" at the Patent Office by filing U.S. Provisional Patent Application No. 60/826,492 (the "'492 Provisional Application").  The '762 and '706 Patents are the only patents, foreign or domestic, that ever issued and that purport to claim priority to this provisional application.

15.    The '762 Patent, which is titled "Tissue Management System," was granted on March 4, 2014, issued from a utility patent application filed on October 20, 2006, and lists Duke O. Kasprisin, Paul E. Kozloski, Susan A. Kozloski, Agnes Vercillo, and Jeffrey K. Winstead as named inventors (the "Named Inventors").  The '762 Patent purports to be a continuation-in-part of an earlier utility application filed on September 29, 2006, which was subsequently abandoned, and purports to claim priority to the '492 Provisional Application.

16. The '762 Patent issued with two independent claims (i.e., claims 1 and 12). Claim 1 is directed to a "tissue management system incorporating a database of information, processor, and software program containing an organized set of instructions for tracking the internal processing by a medical establishment of a piece of transplantable material provided by a supplier for subsequent transplantation or implantation into a patient." Claim 12 is directed to a "tissue management system incorporating a database of information, processor, and software program containing an organized set of instructions for tracing a piece of transplantable material received by a medical establishment from a supplier throughout the internal life of the transplantable material within the medical establishment until it is transplanted or implanted into a patient." The elements of the claimed systems consist almost entirely of means-plus-function elements.

17. The '706 Patent, which is also titled "Tissue Management System," was granted on June 2, 2020, issued from a utility patent application filed on October 19, 2007, and lists the same Named Inventors as the '762 Patent. The '706 Patent purports to be a continuation-in-part of the application that issued as the '762 Patent and ultimately purports to claim priority to the '492 Provisional Application.

18. The '706 Patent issued with one independent claim (i.e., claim 1) directed to a "computer-implemented tissue tracing management system for tracing a piece of transplantable material received by a specific medical establishment from a supplier throughout an internal life of the transplantable material within the medical establishment until it is transplanted or implanted into a patient."

19.    By way of the '762 and '706 Patents, BSI improperly sought to claim a patent monopoly to the use of computer systems and databases to comply with developing rules and standards governing the tracking of tissue implants by hospitals and tissue banks.  The issued claims are essentially functional in nature and the patent specifications do not disclose how the claimed systems work or how, technologically or by algorithm, the various claimed functions and features are performed.  The patent specifications do not disclose software source code, architectures, or algorithms and the claims do not purport to require the use of any specialized computer hardware or other novel computer components.  Rather, the patent specifications make clear that the alleged inventions may use generic, standard computing to perform most, if not all, of the claim elements.

20.    For example, claims 1 and 12 of the '762 Patent are only loosely tethered to a computer-enabled system with the abstract idea of automating various steps to track tissue transplants and complying with safety protocols and mandates. The Named Inventors revealed as much in the affidavits they submitted during prosecution.  *See* Kasprisin Aff. ¶¶ 16–18, 21, 22 (Feb. 4, 2011) (repeatedly referring to the alleged invention as "this process invention," "the claimed process invention," "the claimed process," or "my process invention"); Vercillo Aff. ¶¶ 16–18, 21, 22 (Feb. 4, 2011) (repeatedly referring to the alleged invention as "the claimed process," "this process invention," "the claimed process invention," or "my process invention").  They viewed their alleged inventions as simply processes or methods.

21.    The claims recite no additional inventive concept.

**BSI's Failures to Disclose Material Information to the Patent Office**

22.    During the prosecution of the '762 and '706 Patents, BSI never submitted to the patent examiner for his consideration copies of the rules and standards issued by the FDA and the Joint Commission, as well as by the American Association of Blood Banking and the College of American Pathologists, despite explicitly referencing and acknowledging them in the patent specifications.  *See, e.g.*, '762 Patent, 4:46–53.  These material prior art references would have revealed to the patent examiner, for example, that most, if not all, of the claimed functions were outlined in and specifically required by the Joint Commission's accreditation manual and handbook.

23.    With respect to the ImplantMotion, SafeNET, GraftTracker, and Owens & Minor Cyrus Implant Tracking System technologies mentioned above, neither BSI nor its patent prosecutor disclosed to the patent examiner any manuals, specifications, product datasheets, screen shots, press releases, brochures, or any other information concerning these systems so that the patent examiner could have considered how these potential prior art systems functioned and operated.  BSI and its patent prosecutor also did not disclose any similar information concerning the Tissue TrackCore system or even BSI's own TRACS4Life system, which is significant given that both the '762 and '706 Patents are stated to be based on continuation-in-part applications.

24.     On information and belief, the Named Inventors were aware of at least
the SafeNET, GraftTracker, Owens & Minor Cyrus Implant Tracking System, and
Tissue TrackCore technologies, but they misled the patent examiner regarding their
commercial launch dates and status as potential prior art.  In the affidavits submitted
during patent prosecution, two of the named inventors represented to the patent
examiner as follows:

> Since BSI brought its TRACS4 LIFE tissue management system to
> market incorporating my process invention, at least five other
> companies have tried to develop similar tissue management systems,
> including General Electric, McKesson Medical, Cerner Corporation.
> LPIT Solutions (Tissue Track Core software), and Champion Medical
> Technologies (Graft Tracker software).    I believe that these
> companies are responding within the marketplace to the commercial
> success of BSI's TRACS4 LIFE system and its ability to satisfy the
> long-felt need within the medical industry for methods and systems
> for reliably tracking and tracing blood and tissue products.

*See* Kasprisin Aff. ¶ 22 (Feb. 4, 2011) (emphasis added); Vercillo Aff. ¶ 22 (Feb. 4,
2011).

25.     Additionally, during the prosecution of the '762 and '706 Patents,
neither BSI nor its patent prosecutor provided the patent examiner copies of the
March 28, 2008 and April 8, 2008 International Search Reports conducted by a
different examiner in connection with related PCT applications, who determined
that various prior art references—not all of which were submitted to the examiner
of the '762 and '706 Patents—had "particular relevance" and who found that "the
claimed invention cannot be considered to involve an inventive step when the [prior
art] document is combined with one or more other such [prior art] documents, such

combination being obvious to a person skilled on the art." *See* Internation Search Report, Application No. PCT/US07/22298 (Apr. 8, 2008); Internation Search Report, Application No. PCT/US07/21120 (Mar. 28, 2008).

26.     Moreover, during the prosecution of the '706 Patent, neither BSI nor its patent prosecutor alerted the patent examiner overseeing the prosecution of the '706 Patent to the multiple rejections, the multiple advisory actions, or the appeal briefing involving a different patent examiner overseeing a failed, co-pending continuation application so that the prior analysis could have been considered.

### BSI and Its Patent Prosecutor Acknowledge Invalidity Issues While Prosecuting a Related Patent Application

27.     In 2020, as part of BSI's failed efforts to prosecute yet another continuation application (No. 14/192,542) that, again, claimed priority to the '492 Provisional Application, BSI and its patent prosecutor were forced to acknowledge invalidity issues raised by the abstract subject matter BSI was improperly seeking—in the face of the Supreme Court's decisions in *Alice Corp.* v. *CLS Bank Int'l*, 573 U.S. 208 (2014) and *Bilksi* v. *Kappos*, 561 U.S. 593 (2010) and the Patent Office patent prosecution guidelines—to secure through the patent system.  As BSI's patent prosecutor admitted to the Patent Office's Patent Trial and Appeal Board:

> What I've been trying to do for the last six years as my client is too well aware here is jump through the various hoops that came along, you have the *Bilski* and the *Alice* [decisions], all of the subsequent

cases; and then the revised [Patent Office] guidelines to try to comply
as the landscape changed.

*See* Oral Hr'g Tr. at 13:6–10, *Ex Parte Kasprisin*, Appeal No. 2019-005491

(P.T.A.B. July 7, 2020).

28.     The Board expressly held that claims of the scope that BSI would later

attribute to the '762 and '706 Patents (as discussed below) are invalid because they

claim unpatentable subject matter:

> When considered collectively and under the broadest reasonable
> interpretation, the limitations of claim 1 recite a method for tracking
> processing of transplantable material to ensure compliance with
> procedures by assigning, providing, entering, processing, and limiting
> access to data, inspecting the material, assessing a patient,
> investigating the results of the assessment, and reporting the results
> of the investigation.   This is an abstract idea comprising "[m]ental
> processes-concepts performed in the human mind (including an
> observation, evaluation, judgment, opinion)" and a "[c]ertain
> method[] of organizing human activity— . . . managing personal
> behavior or relationships or interactions between people (including
> social activities, teaching, and following rules or instructions)."

*See* Decision at 18, *Ex Parte Kasprisin*, Appeal No. 2019-005491 (P.T.A.B. July 22,

2020) (quoting the Patent Office's 2019 Revised Patent Subject Matter Eligibility

Guidance, 84 Fed. Reg. 50, 52 (Jan. 7, 2019)) (alterations in original).

**BSI's Baseless Cease-and-Desist Letter to TrackCore**

29.     Years passed since the '762 and '706 Patents were granted and then,

suddenly, on May 16, 2025, BSI had the attorney who prosecuted the '762 and '706

Patents send a cease-and-desist letter to TrackCore purporting to assert those patents

and alleging that TrackCore's software products infringed them.   *See* Ex. C.

Specifically, BSI asserted that "BSI believes that [TrackCore's] tissue tracking and

implant tracking system infringes at least one claim of each of the [’762 and ’706 Patents]” and demanded that TrackCore “immediately cease its marketing and sale of its infringing tissue tracking and tracing system to its customer hospitals in the absence of a paid license from BSI, and payment of reasonable royalties for its past infringing sales.” *Id.*

30.     In its cease-and-letter, BSI failed (a) to identify the specific TrackCore software product(s) BSI believed infringed its patents; (b) to identify any specific claim(s) of either patent that TrackCore was allegedly infringing; (c) to include any claim charts or any facts or analysis that supposedly led BSI to conclude that any TrackCore software product actually reads on all of the elements of any claim of either the ’762 or ’706 Patent; and (d) to offer any explanation why, after TrackCore software products have been on the market for years, BSI sat on its purported patent rights only to suddenly assert them.  It was apparent that BSI failed to conduct any analysis, investigation, or due diligence on TrackCore’s software before sending its threatening letter.

31.     In support of its infringement allegations, however, and in an improper effort to excuse its lack of due diligence, BSI asserted a broad construction of its patent claims, stating that, “[b]ecause the TrackCore system seems to be designed to ensure compliance with the safety protocols in an automated manner that overcomes the risk of human employee lapses or errors, it <u>necessarily satisfies</u> the requirements of BSI’s patent claims.”  *See* Ex. C at 2 (emphasis added).

32.     BSI's asserted claim construction not only further confirmed that, in its view, the Asserted Patents were directed to an unpatenable abstract idea but also, given their breadth, confirmed, for example, that there was insufficient support for the full breadth of the claims.  BSI essentially admitted that it had improperly sought and believed it had secured a patent monopoly ensnaring all software systems that incorporated computer technology to comply with applicable rules and standards for hospitals and tissue banks.

33.     BSI's asserted claim construction further confirmed that its failures to provide disclosures regarding the aforementioned rules and standards, the potential prior art systems, and misleading statements about the prior art status of the systems were material and that the patents would not have been issued but for BSI's decision to shield the patent examiner from these standards and existing technologies.

34.     On June 16, 2025, TrackCore responded to BSI's cease-and-desist letter, pointing out various grounds for invalidity and unenforceability with the Asserted Patents, including those mentioned above, and explaining that TrackCore® Operating Room did not infringe the Asserted Patents.  Ex. D.  Among the grounds for invalidity, TrackCore identified prior art references that anticipate and/or render obvious either alone or in combination with other prior art references or products, the claims of the '762 and '706 Patents, including U.S. Publication No. US 2005/0184149 (Aug. 25, 2005) ("Auchinleck"), which is directed to a method and apparatus "for ensuring that blood transfused into a patient is the correct blood for that patient, and that a complete audit trail is created that will allow later tracing of

blood from donation through to transfusion." (The '762 and '706 Patents purport to cover systems that concern transplantable material, which is defined to include "tissue" such as blood. *See, e.g.*, '762 Patent, 1:46–49.)

35.     TrackCore declined BSI's request for a license and refused to "cease" the marketing and sales of its software. TrackCore, however, requested that BSI provide any "claim charts BSI prepared with respect to at least the independent claims of the '762 and '706 patents so that we can better understand BSI's grounds for accusing TrackCore's software of infringement." Ex. D.

**BSI Reiterates Its Cease-and-Desist Demand to TrackCore
and Makes a New, Similar Demand to TrackCore
Customer Leidos Partnership for Defense Health**

36.     Over two months later, on August 28, 2025, BSI responded to TrackCore's June 16 correspondence. In its response, BSI failed to dispute TrackCore's suggestion that BSI had failed to conduct any analysis, investigation, or due diligence on TrackCore's software before sending its cease-and-desist letter, and, instead, stated that "BSI has not had an opportunity yet to inspect the software architecture of TrackCore's tissue management system and its functionalities." Ex. E. Although BSI did allege that TrackCore infringed the three independent claims of the '762 and '706 Patents, BSI failed to include, as TrackCore had requested, any claim charts or any facts or analysis that supposedly led BSI to conclude that any TrackCore software product reads on the elements of those claims.

37.     BSI also asserted incorrect views that, among other things, only prior art that was available "more than one year before" the filing date of the '492 Provisional Application was relevant in terms of invalidity and BSI's duty of candor before the Patent Office during prosecution under 37 C.F.R. § 1.56; and that BSI did not need to disclose multiple rejections and other examiner actions from a related co-pending application to the patent examiner overseeing the '762 and '706 Patents.

38.     BSI's allegations in the above-referenced communications, and in particular its infringement allegations and assertions with respect to invalidity and unenforceability, were objectively meritless, false, incorrect, and/or inaccurate.  On information and belief, BSI knew or should have known of their lack of merit, falsity, incorrectness, and/or inaccuracy (or disregarded them), but asserted them anyway in bad faith and for competitive advantage.

39.     In the same August 28 correspondence, BSI reasserted that it "continues to demand that TrackCore, Inc. and LPDH immediately cease their marketing and sale of the infringing TrackCore tissue tracking and tracing system to their customer hospitals in the absence of a paid license from BSI, and payment of reasonable royalties for its past infringing sales."  *Id.*  "LPDH" is a defined term in the letter and an express reference to the Leidos Partnership for Defense Health, which is one of TrackCore's customers.

**BSI's Correspondence with TrackCore Customers**
**Leidos Partnership for Defense Health and the U.S. Defense Health Agency**

40.　　On that same day, BSI had its same counsel forward its August 28 letter and copies of the Asserted Patents to the Virginia offices of TrackCore customers Leidos Partnership for Defense Health and the U.S. Defense Health Agency.  Exs. F–G.  In its cover letter to these customers, BSI asserted that "BSI has been engaged in a patent infringement dispute with TrackCore since May16, 2025 under the BSI patents. . . . While BSI's immediate focus is directed to TrackCore, we want you to be aware of the existence of this dispute."  *Id.*

## COUNT I
## DECLARATORY JUDGMENT OF NONINFRINGEMENT

41.　　TrackCore repeats and incorporates by reference all previous paragraphs of its Complaint as though fully set forth herein.

42.　　BSI has accused TrackCore of infringing the '762 and '706 Patents.

43.　　There is an actual and justiciable controversy between BSI and TrackCore regarding the alleged infringement of the '762 and '706 Patents.

44.　　TrackCore has not infringed, does not currently infringe, and has not actively induced others to infringe or contributed to the infringement of any claim of the '762 and '706 Patents, either literally or under the doctrine of equivalents.

45.　　For example, claims 1 and 12 of the '762 Patent, which are that patent's only independent claims, each require a "means for processing such entered data by the software program which is built upon the standard operating procedures [adopted by the medical establishment]," and claim 1 of '706 Patent, which is its

only independent claim, requires a "software program incorporating a comprehensive set of standard operating procedures adopted by the specific medical establishment."  In contrast, the TrackCore software has its own operating procedures for processing tissues; it is not built upon and does not incorporate standard operating procedures adopted by the health care facility.

46.    A judicial declaration of noninfringement of the '762 and '706 Patents is necessary and appropriate to resolve this controversy.

## COUNT II
## DECLARATORY JUDGMENT OF INVALIDITY

47.    TrackCore repeats and incorporates by reference all previous paragraphs of its Complaint as though fully set forth herein.

48.    An actual dispute and justiciable controversy exist between the parties as to the validity of the '762 and '706 Patents.

49.    The claims of the '762 and '706 Patents are invalid for failing to comply with the conditions and requirements of the patent laws of the United States, including, specifically and without limitation, 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto.

50.    A judicial declaration of noninfringement of the '762 and '706 Patents is necessary and appropriate to resolve this controversy.

## COUNT III
## DECLARATORY JUDGMENT OF UNENFORCEABILITY

51.    TrackCore repeats and incorporates by reference all previous paragraphs of its Complaint as though fully set forth herein.

52. An actual dispute and justiciable controversy exist between the parties as to the enforceability of the '762 and '706 Patents.

53. The claims of the '762 and '706 Patents are unenforceable based on the doctrine of inequitable conduct in that, on information and belief, BSI intentionally misled the Patent Office through intentional statements and omissions during the prosecution of the '762 and '706 Patents and failed to satisfy its duty of candor before the Patent Office when prosecuting these patents.

54. A judicial declaration of the unenforceability of the '762 and '706 Patents is necessary and appropriate to resolve this controversy.

## COUNT IV
## LANHAM ACT § 43(A)(1)(B), 15 U.S.C. § 1125(A)(1)(B)

55. TrackCore repeats and incorporates by reference all previous paragraphs of its Complaint as though fully set forth herein.

56. Upon information and belief, BSI has, in bad faith, made, distributed, caused to be distributed, authorized the distribution of, and/or otherwise disseminated false and/or misleading statements that misrepresent the nature, characteristics, and/or qualities of TrackCore's software products.

57. Upon information and belief, BSI's bad faith misrepresentations deceived, or had the capacity to deceive, TrackCore's customers.

58. Upon information and belief, BSI's bad faith misrepresentations had a material effect on TrackCore's customers' purchasing decisions in that it was likely to influence the purchasing decision of TrackCore's customers.

59.     Upon information and belief, BSI's bad faith misrepresentations have been placed in interstate commerce and have had, and continue to have, an effect on interstate commerce.

60.     Upon information and belief, TrackCore is or is likely to be damaged by BSI's bad faith misrepresentations by, among other things, requiring TrackCore to incur expenses necessary to counteract the effect of BSI's bad faith misrepresentations and by lessening or threatening to lessen the goodwill associated with TrackCore's software products.

61.     BSI's actions violate Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

## COUNT V
## MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## MINN. STAT. § 325D.44

62.     TrackCore repeats and incorporates by reference all previous paragraphs of its Complaint as though fully set forth herein.

63.     Upon information and belief, BSI has, in bad faith, disparaged TrackCore's products by false and misleading representations of fact and engaged in unfair methods of competition or unconscionable acts and practices, which were unethical, oppressive, or unscrupulous.

64.     Upon information and belief, BSI intended for publication of the false statements to result in harm to TrackCore's pecuniary interests, or either recognized or should have recognized that its false statements were likely to do so.

65.     Upon information and belief, BSI knew that the statements were false and/or acted in reckless disregard of their truth or falsity.

66.     TrackCore has suffered or is likely to suffer damages and economic losses as a result of BSI's false statements, including expenses necessary to counteract the effect of BSI's false statements and by lessening or threatening to lessen the goodwill associated with TrackCore's software products.

**COUNT VI**
**DEFAMATION**

67.     TrackCore repeats and incorporates by reference all previous paragraphs of its Complaint as though fully set forth herein.

68.     BSI published wrongful, false, and defamatory misrepresentations to TrackCore's customers by sending them the baseless patent infringement assertion letters.

69.     These defamatory statements were made to customers of TrackCore, including Leidos Partnership for Defense Health and the U.S. Defense Health Agency.  The defamatory statements were not privileged.

70.     On information and belief, these defamatory statements were made deliberately, intentionally, and with malice.  BSI knew or should have known that the defamatory statements would cause or were likely to cause harm to TrackCore.

71.     As a result of BSI's false and misleading statements, TrackCore has suffered harm to its reputation, including by causing TrackCore's customers to question their ability to continue using TrackCore's products without threat of

litigation and causing TrackCore to incur expenses, including expenses necessary to counteract the effect of BSI's statements and by lessening or threatening to lessen the goodwill associated with TrackCore's software products.

## DEMAND FOR JURY TRIAL

TrackCore demands a trial by jury of all issues so triable.

## REQUESTED RELIEF

For the reasons set forth above, TrackCore respectfully requests that this Court grant judgment in TrackCore's favor, entering an Order with the following:

A.    As to Count I of the Complaint, entry of a declaratory judgment that the asserted claims of the '762 and '706 Patents are not infringed;

B.    As to Count II of the Complaint, entry of a declaratory judgment that the asserted claims of the '762 and '706 Patents are invalid;

C.    As to Count III of the Complaint, entry of a declaratory judgment that the claims of the '762 and '706 Patents are unenforceable;

D.    As to Counts I–III of the Complaint, an award to TrackCore of attorneys' fees, costs, and expenses incurred by TrackCore in prosecuting its Complaint, including pursuant to 35 U.S.C. § 285, upon a finding that this is an exceptional case;

E.    As to Count IV of the Complaint, entry of judgment that BSI has violated Lanham Act § 43(a)(1)(B); an award, pursuant to Lanham Act § 35(a), of any and all profits gained by BSI as a result of its actions, any and all damages sustained by TrackCore, together with pre- and post-judgment interest, and TrackCore's costs incurred in prosecuting its Complaint; and an award to TrackCore of attorneys' fees incurred by TrackCore in prosecuting its Complaint, including pursuant to Lanham Act § 35(a), upon findings that this is an exceptional case and that TrackCore is the prevailing party;

F.    As to Count V of the Complaint, entry of judgment that BSI has violated Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44; an award of TrackCore's costs in prosecuting its

Complaint upon a finding that TrackCore is the prevailing party; and an award of TrackCore's attorneys' fees, including pursuant to Minn. Stat. § 325D.45.2, upon findings that BSI willfully engaged in the trade practice knowing it to be deceptive and that TrackCore is the prevailing party;

G.   As to Count VI of the Complaint, entry of judgment in TrackCore's favor and an award of damages in an amount to be proven at trial, together with pre- and post-judgment interest;

H.   As to Counts IV–VI of the Complaint, an injunction prohibiting BSI, its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with BSI from making statements that are the same as or similar to the statements alleged herein in the future;

I.   An injunction prohibiting BSI from engaging in the unlawful, unfair, and anticompetitive actions and practices described in this Complaint and from any other unlawful, fraudulent, or unfair acts or practices aimed at obstructing TrackCore's business;

J.   An award of damages resulting from the wrongful conduct alleged in this Complaint;

K.   Restitution of any amounts BSI derived from the unfair and anticompetitive conduct alleged in this Complaint;

L.   An award of costs and expenses incurred by TrackCore in connection with this action;

M.   An award of any additional damages that the Court deems appropriate; and

N.   An award of such additional and other relief as the Court deems just and proper.

Dated: September 12, 2025

Respectfully submitted,

STINSON LLP

*Of Counsel*:

*/s/ Ruth Rivard*
Ruth Rivard (0327591)

Catherine Nyarady (*pro hac vice pending*)
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
cnyarady@paulweiss.com

50 South Sixth Street
Suite 2600
Minneapolis, MN 55402
(612) 335-1500
ruth.rivard@stinson.com

*Attorneys for Plaintiff TrackCore LLC*

David E. Cole (*pro hac vice pending*)
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
dcole@paulweiss.com